## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

RUBEN J. ESCANO,

      Plaintiff,

v.                                        No. 2:21-cv-0884 RB-GBW

SYMMETRY FINANCIAL GROUP OF
NORTH CAROLINA, LLC; MUTUAL
OF OMAHA INSURANCE COMPANY;
BRANDON ELLISON; BRIAN POPE;
and DOES 1 through 10,

      Defendants.

### <u>MEMORANDUM OPINION AND ORDER</u>

Ruben Escano, whose telephone number is listed on the National Do Not Call Registry, received a number of unsolicited telemarketing calls in 2019–2021. Escano alleges that Defendants Symmetry Financial Group of North Carolina, LLC (SFG), Brandon Ellison, and Brian Pope made the calls on behalf of Defendant Mutual of Omaha Insurance Company (MOIC). Escano brings suit under the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, and related regulations. MOIC moves to dismiss and argues that Escano's claims are contrary to recent Supreme Court precedent; that he fails to establish SFG made the calls; and that he has not plausibly demonstrated that MOIC is directly or vicariously liable for the calls. The Court finds that Escano fails to show that MOIC is directly liable for the calls and will grant the motion in part on that issue. Otherwise, the Court will deny the motion for the reasons outlined in this opinion.

## I.      Factual Background[1]

MOIC is a Nebraska corporation that sells life and health insurance plans. (*See* Doc. 1-1 (Compl.) ¶¶ 4, 56.) SFG is a limited liability company that runs an "insurance telemarketing operation" and sells life and health insurance plans on behalf of MOIC. (*See id.* ¶¶ 3, 47, 50, 55, 76–77.) SFG calls telephone subscribers using an "automatic telephone dialing system" (ATDS), which is "equipment that has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers . . . ." (*Id.* ¶¶ 26–27, 48 (citing 47 U.S.C. § 227(a)(1)).)

MOIC authorized SFG salespersons to act "as agents of [MOIC] to potential customers[,]" "published marketing material which states that SFG salespersons are agents of [MOIC,]" and paid sales commissions to SFG for the insurance enrollments it produced. (*See id.* ¶¶ 61, 63–64, 78.) "SFG salespersons communicated regularly with [MOIC] and received directions from [MOIC]." (*See id.* ¶¶ 75, 79.) SFG "[found] and qualifie[d] potential customers for insurance plans . . . by calling American telephone subscribers who have never consented to be called . . . ." (*Id.* ¶ 50–51.) To qualify potential customers, the SFG representatives asked the telephone subscribers to provide their age and zip code. (*Id.* ¶ 51.) Once qualified, SFG then attempted to enroll the potential customers into insurance plans. (*Id.* ¶ 52.) "[MOIC] knew that the volume of insurance enrollments produced by SFG could not be achieved merely by calling customers who had consented to be called" or "without using an ATDS." (*Id.* ¶ 59–60.) Moreover, MOIC prohibited SFG salespersons from revealing MOIC's identity unless and until telephone subscribers "retroactively agreed to [a] TCPA violation." (*Id.* ¶ 83.)

---

[1] The Court recites the facts relevant to this motion as they are derived from the Complaint and the exhibit attached thereto. The Court accepts all well-pleaded factual allegations as true and views them in a light most favorable to Escano. *See Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013).

Escano, a resident of New Mexico, registered his cellular telephone number on the Federal Communications Commission's (FCC) National Do Not Call Registry. (*Id.* ¶¶ 9, 13.) Between February 25, 2019, and August 3, 2021, Escano received at least 19 unsolicited telemarketing sales calls regarding life and health insurance. (*Id.* ¶¶ 13, 19.) Escano alleges that SFG, Ellison, and Pope initiated the calls on behalf of MOIC. (*Id.* ¶¶ 14, 57.) Escano does not have an established business relationship with, nor has he consented to sales calls from, any defendant. (*Id.* ¶¶ 22, 24.)

Of the 19 calls, 12 "began with an artificial or prerecorded message" that stated the calls were "coming from fictitious entities including[] 'Senior Solutions' and 'Senior Health Advisors.'" (*Id.* ¶ 17.) The remaining seven calls did not have such a message, but instead began "with a digital beeping sound before . . . a live phone representative [came] on the line." (*Id.* ¶ 18.) Six of the seven calls "also contained at least three seconds of silence . . . [before] a live phone representative [came] on the line." (*Id.*) He states that of the calls he "stayed on the line for," a representative asked him "for his age, zip code, and full name." (*Id.* ¶ 19.) "The content of all of the calls was substantially similar enough that a reasonable person would identify the communications as coming from the same entity or group of entities." (*Id.*) He alleges that SFG "spoof[ed] the phone numbers from which it called so that [his] cell phone . . . would show inaccurate caller ID information, and by instructing its employees not to immediately communicate the true name of the company calling even when [he] . . . inquired as to the true name of the company." (*Id.* ¶ 16; *see also id.* ¶¶ 28–46 (identifying the phone numbers that called Escano).)

During one of the calls, an SFG salesperson sent Escano an email that contained a photo showing MOIC marketing material. (*Id.* ¶ 69; *see also* Compl. Ex. A.) The material provides: "This is a solicitation of insurance and an insurance agent will contact you by telephone. . . . Licensed insurance agents are authorized to sell this Medicare supplement insurance policy on behalf of

Mutual of Omaha Insurance Company." (Compl. Ex. A.) The photo also shows the salesperson's computer screen, which displays "an email from [MOIC that] says, 'Received Thank You Jo Becerra Mutual of Omaha Business.'" (Compl. ¶ 74; *see also* Compl. Ex. A.) Escano asserts that this salesperson, who was identified by her name, phone number, and email address on the marketing material, "was an agent of [MOIC] who" represented herself as "selling insurance via telephone on behalf of [MOIC] . . . ." (Compl. ¶ 71.) The salesperson's email address ends in "mylifeadvisers.com" and "automatically re-directs to . . . SFG's website."[2] (*Id.* ¶ 72.)

Escano asserts that "[d]uring at least one of the calls, an SFG salesperson told [him] that the SFG salesperson was 'mandated' to not reveal the identity of the insurance company on whose behalf his company was calling until [he] retroactively consented to be called in a manner that violated the TCPA." (*Id.* ¶ 80.) The salesperson confirmed that "[w]e work directly for the insurance company." (*Id.* ¶ 81.) Escano contends that Defendants "knew that the calls SFG transmitted to [him] were transmitted in violation of the TCPA." (*Id.* ¶ 82.)

## II.    Legal Standard for Motions to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Emps.' Ret. Sys. of R.I. v. Williams Cos.*, 889 F.3d 1153, 1161 (10th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quotation omitted). The Court will "accept as true 'all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.'" *Schrock v.*

---

[2] Additionally, "SFG's website has a section called 'Our Trusted Partners[,]' which lists [MOIC] as one of SFG's trusted partners." (Compl. ¶ 73.)

*Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013) (quotation omitted).[3]

## III.    Analysis

MOIC argues that dismissal of Escano's claims against MOIC is warranted on several grounds: (1) the "TCPA [ATDS] claim is contrary to recent precedent from the United States Supreme Court"; (2) Escano fails to show that SFG made the calls at issue; (3) there are insufficient factual allegations to show that MOIC was directly liable for making the telemarketing calls; and (4) there are insufficient factual allegations to show that SFG, Ellison, or Pope "were acting as authorized agents of MOIC, at MOIC's request, and under MOIC's direction and control." (Doc. 20 at 1–2, 10.) The Court will address each of the arguments in turn.

### A.    Escano has plausibly alleged that he was contacted via an ATDS.

Escano alleges that Defendants called his cellular telephone using an ATDS, which is prohibited by the TCPA. (Compl. ¶ 27.) *See also* 47 U.S.C. 227(b)(1)(A)(iii). The TCPA defines an ATDS as "equipment which has the capacity . . . to store or produce telephone numbers to be called, using a random or sequential number generator; and . . . to dial such numbers." 47 U.S.C. § 227(a)(1). MOIC first argues that Escano's "claims fail because the Complaint is devoid of any non-conclusory allegations of fact establishing that the alleged agents used an [ATDS]." (Doc. 20 at 4.) The Court disagrees.

"Although alleging specific details regarding a defendant's use of an ATDS can pose a challenge prior to conducting discovery, 'courts nonetheless have held that to sustain a claim under

---

[3] "[W]hile ordinarily, a motion to dismiss must be converted to a motion for summary judgment when the court considers matters outside the complaint, *see* Fed. R. Civ. P. 12(d), matters that are judicially noticeable do not have that effect . . . ." *Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Tr. 2006-3*, 825 F. Supp. 2d 1082, 1122 (D.N.M. 2011) (citation omitted). Escano asks the Court to take judicial notice of a screenshot of his phone and a "series" of MOIC documents of unknown origin. (*See* Docs. 27 at 17; 27-A; 27-B.) Escano provides no grounds on which to find this material is judicially noticeable, and the Court declines to consider it for purposes of this motion.

the TCPA, a plaintiff must plead more than the bare allegation that an ATDS was used.'" *Gonzalez v. HOSOPO Corp.*, 371 F. Supp. 3d 26, 34 (D. Mass. 2019) (quoting *Kruskall v. Sallie Mae Serv., Inc.*, No. 15-cv-11780, 2016 WL 1056973, at *3 (D. Mass. Mar. 14, 2016)) (internal quotation marks omitted); *see also Dendy v. Chartrand*, No. 18-CV-1118-WPJ, 2019 WL 719762, at *3 (D.N.M. Feb. 20, 2019) ("The Court recognizes the difficulty of alleging details about an ATDS before discovery.") (citation omitted); *Callier v. MultiPlan, Inc.*, No. EP-20-CV-00318-FM, 2021 WL 8053527, at *17 (W.D. Tex. Aug. 26, 2021) ("it is impracticable to expect plaintiffs to plead specific facts about a telemarketer's technological processes before they have the benefit of discovery"). "In light of these tensions, a plaintiff is permitted to rely on indirect allegations, such as the content of the message, the context in which it was received, and the existence of similar messages to raise an inference that an ATDS was used." *Gonzalez*, 371 F. Supp. 3d at 34–35 (quoting *Kruskall*, 2016 WL 1056973, at *3). Here, Escano includes factual allegations regarding the general content of the phone calls, the phone numbers from which they came, and the fact that he did not have a relationship with the defendants. (*See, e.g.*, Compl. ¶¶ 17–19, 22–24, 28–46, 69, 80.) He also alleges that some "of the calls began with an artificial or prerecorded message[,]" and other calls began "with a digital beeping sound" and/or "at least three seconds of silence" before a representative came on the line.[4] (*Id.* ¶¶ 17–18.) These allegations are sufficient to raise a plausible inference that Defendants used an ATDS. *See, e.g.*, *Dendy*, 2019 WL 719762, at *3 (finding sufficient allegations of ATDS where plaintiff alleged that defendants did not manually make the phone calls, "[p]laintiff was unable to return the call to the same number that dialed her,

---

[4] MOIC argues in its reply brief that Escano "relies on allegations that . . . establish a number of differences" between the calls, "suggesting that the calls were not made from the same system . . . ." (Doc. 30 at 5 (emphasis omitted).) This argument may be further explored after discovery. At this juncture, the Court finds that Escano pled sufficient facts to plausibly allege that Defendants used an ATDS.

and the messages were prerecorded and sounded artificial") (citations omitted); *Hampton v. Barclays Bank Delaware*, No. 18-4071-DDC-ADM, 2019 WL 6727083, at *11 (D. Kan. Dec. 11, 2019) (allegations supported a plausible finding that defendant used an ATDS where plaintiff alleged that "he received calls from the same phone number," "he heard an 'artificial sounding computer voice' which waited for plaintiff to press a number on the keypad, . . . and he recognized the number on his phone as one used frequently by [the defendant] to call him") (citation omitted); *Asher v. Quicken Loans, Inc.*, No. 17-cv-1203, 2019 WL 131854 at *3 (D. Utah Jan. 8, 2019) (finding calls "bore indicia of an automated dialer" when the plaintiff alleged that he experienced "a delay before [he wa]s able to speak to anyone").

MOIC argues that three cases undercut a finding that Escano sufficiently alleged the use of an ATDS: *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021); *Watts v. Emergency Twenty Four, Inc.*, No. 20-CV-1820, 2021 WL 2529613 (N.D. Ill. June 21, 2021); and *Camunas v. National Republican Senatorial Committee*, 541 F. Supp. 3d 595 (E.D. Pa. 2021). (*See* Docs. 20 at 4–5; 30 at 4–5.) All three cases are distinguishable.

In *Duguid*, the plaintiff, who did not have a Facebook account,[5] "received several login-notification text messages from Facebook, alerting him that someone had attempted to access the Facebook account associated with his phone number from an unknown browser." 141 S. Ct. at 1168. The plaintiff conceded that Facebook had not used a random or sequential number generator to send him the alert text, but he argued that the equipment in question must qualify as an ATDS because it "had the capacity to store and dial telephone numbers . . . ." *See Camunas*, 541 F. Supp. 3d at 602 (discussing *Duguid*, 141 S. Ct. at 1171). The Supreme Court disagreed and held that the

---

[5] Facebook speculated that the plaintiff may have been "assigned a recycled cell phone number that previously belonged to a Facebook user who opted to receive login notifications." *See Duguid*, 141 S. Ct. at 1168 n.3.

statutory definition of an ATDS "necessarily excludes equipment that does not use a 'random or sequential number generator' to store or produce numbers, such as automated systems that made 'targeted, individualized' calls 'to numbers linked to specific accounts.'" *Callier*, 2021 WL 8053527, at *17 (quoting *Duguid*, 141 S. Ct. at 1168).

The circumstances in *Watts* were similar to those in *Duguid*. In *Watts*, the plaintiff alleged that the defendant, an alarm monitoring service, called his cell phone to alert him "every time an alarm [was] tripped at a business at which he" had worked several years prior to the lawsuit. 2021 WL 2529613, at *1. He alleged that the defendant "use[d] an ATDS to call his stored cell phone number without his 'express written consent' and despite his repeated demands not to be contacted." *Id.* The defendant moved to dismiss and argued that the plaintiff failed to plead facts to show that it used an ATDS. *Id.* at *2. As in *Dugiud*, the plaintiff acknowledged that the defendant did not utilize a system that "use[]d a random or sequential number generator." *Id.* at *3. Rather, he argued, the defendant's "dialing equipment is capable of contacting thousands of people a day, stores numbers . . . of persons who have not given their express written consent to be called or who have since withdrawn their consent, and is used to call [him] . . . continually and at all hours of the day and night." *Id.* (quotation marks and citations omitted). The court agreed that these failed to show that the defendant used an ATDS as defined in the statute and as interpreted in *Duguid*. *Id.* Because the defendant stored and called the plaintiff's number intentionally, it was not a "random" call. *See id.*

MOIC argues that here, as in *Duguid* and *Watts*, Escano "makes allegations *inconsistent* with random generated calls, claiming instead that Defendants specifically *targeted* him." (Doc. 20 at 5 (citing Compl. ¶ 50).) MOIC bases this argument on paragraph 50 of the Complaint, which states that "SFG [found] and qualifie[d] potential customers for insurance plans[,]" then "an SFG

salesperson enroll[ed] such customers in the plans." (*Id.* (citing Compl. ¶ 50).) MOIC understands the Complaint to allege that SFG did not randomly call phone numbers, but rather, that SFG found and called a specific group of potential customers. (*See* Doc. 20 at 5.) Escano disputes MOIC's position as "an imprecise reading of the Complaint." (*See* Doc. 27 at 7.) He explains that paragraph 50 is not meant to assert that SFG found customers before making telemarketing calls, but instead that SFG randomly called telephone subscribers and asked them questions to qualify them for insurance plans. (*Id.* at 7–8 (citing Compl. ¶ 51).) A reading of the Complaint supports Escano's explanation. The Complaint alleges that "SFG [found] potential customers by calling American telephone subscribers who have never consented to be called by SFG." (Compl. ¶ 51.) During these calls, "an SFG phone representative ask[ed] the telephone subscriber questions to qualify them for specific insurance plans." (*Id.*) In other words, SFG used an ATDS to call random telephone subscribers and then qualified potential customers during these unsolicited calls. (*See id.*) The circumstances here are distinguishable from those in *Duguid* and *Watts*.

*Camunas* involved a motion to dismiss a complaint brought for alleged TCPA violations based on unsolicited text messages. 541 F. Supp. at 598, 602–03. The *Camunas* court noted that courts largely "permit the allegation of an [ATDS] to be pled on information or belief, but require additional factual information, such as the absence of a relationship between the parties[,] the random nature of the automation device[,]" and "at least some [ ] detail regarding the content of the messages or calls, thereby rendering the claim that an ATDS was used more plausible." *Id.* at 602–03 (quotations omitted). With respect to text messages in particular, courts also look at whether the text messages were sent "from a 'short code' number[, which] supports an inference of ATDS use." *Id.* (quotation omitted) Although the plaintiff in *Camunas* alleged that the text messages "were 'generic and obviously pre-written' and that the [defendant's] website describe[d]

using 'recurring autodialed marketing messages[,]'" the plaintiff failed to detail the content of the messages, the phone number that sent the messages, whether he had a relationship with the defendant, or whether the messages were sent from a "short code" number. *Id.* at 603. Because of these deficiencies, the court found that the plaintiff had not "allege[d] sufficient facts to 'nudge[]' his claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

*Camunas* is inapposite to Escano's lawsuit. First, Escano did not receive text messages, so whether they were sent from a "short code" number is not at issue. More importantly, Escano included factual allegations regarding the content of the phone calls, the phone numbers from which they came, and the fact that he did not have a relationship with the defendants. (*See, e.g.*, Compl. ¶¶ 17–19, 22–24, 28–46, 69, 80.)

In short, the Complaint plausibly alleges that Defendants used an ATDS to make the calls at issue. Escano alleged that he did not have a business relationship with Defendants, and he did not consent to be called by them. (*Id.* ¶¶ 22, 24.) He specifies the phone numbers from which he was called and generally describes the content of the calls. (*See id.* ¶¶ 23, 28–46.) Finally, he alleges that the calls either began with a prerecorded or artificial message, a digital beeping sound, or at least three seconds of silence before a representative came on the line. (*Id.* ¶¶ 17–18.) These allegations are sufficient to support a plausible inference that Defendants used an ATDS and to put Defendants on notice of Escano's claims. The Court will deny MOIC's motion on this issue.

### B.    Escano has sufficiently alleged that SFG made the calls.

MOIC argues that Escano "fails to plausibly allege even that [SFG] made the calls" or offer a "basis for his assertion that they were all related." (Doc. 20 at 10.) MOIC emphasizes differences between the calls: namely, that 12 "calls began with an artificial or prerecorded message" and seven of the calls began "with a digital beeping sound . . . ." (Compl. ¶¶ 17–18; Doc. 30 at 5–6

n.3.)

Yet, MOIC acknowledges Escano's allegations that the calls were all related to "life and health insurance" and that the content of the calls "was substantially similar enough that a reasonable person would identify the communications as coming from the same entity or group of entities." (Doc. 20 at 10 (citing Compl. ¶ 19).) Escano also asserts that for each call in which he talked to a sales representative, the representative asked him for his full name, age, and zip code. (Compl. ¶ 19.) Moreover, he alleges that Defendants agreed that SFG telemarketers would only reveal MOIC's identity if Escano "retroactively agreed to [a] TCPA violation." (*See* Compl. ¶ 83.) Considering the facts as a whole and accepting them as true, the Court finds that Escano has plausibly alleged that SFG was behind the relevant calls.[6]

### C.    Escano has not shown that MOIC is directly liable for the calls.

MOIC argues that Escano fails to show that MOIC is directly liable for making the calls. (*See* Doc. 20 at 5–7.) Regarding "direct liability, '[t]he plain language of section 227(b)(1)(A)(iii) imposes liability upon persons that "make" a telephone call or text.'" *Childress v. Liberty Mut. Ins. Co.*, No. 17-CV-1051 MV/KBM, 2018 WL 4684209, at *3 (D.N.M. Sept. 28, 2018) (quoting *Melito v. Am. Eagle Outfitters, Inc.*, No. 14-CV-02440, 2015 WL 7736547, at *4 (S.D.N.Y. Nov. 39, 2015)). "Courts interpreting this provision 'have held that the verb "make" imposes civil liability only on the party that places the call or text.'" *Id.* (quoting *Melito*, 2015 WL 7736547, at *4). Escano does not allege that MOIC itself placed any phone calls, nor does he argue that MOIC

---

[6] MOIC notes that Escano "has another TCPA case pending before this Court in which he alleges other entities also violated the TCPA by calling the same phone he alleges [SFG] called in this case, and during overlapping time frames." (Doc. 30 at 7.) The fact that Escano has another TCPA lawsuit pending for telemarketing calls related to a completely different product does not detract from his allegations in this matter. *See Escano v. Concord Auto Protect, Inc.*, No. 2:21-cv-0223 MV/CG (lawsuit regarding calls made about extended vehicle warranties in violation of the TCPA).

should be held directly liable. (*See* Doc. 27; Compl. ¶¶ 65, 68.) Thus, the Court will grant the motion with respect to the issue of direct liability.

### D.      Escano has plausibly alleged that MOIC is vicariously liable for the calls.

Finally, MOIC argues that Escano has not established that MOIC is vicariously liable for the calls. (*See* Doc. 20 at 7–14.) The FCC has found that "vicarious liability [may be] imposed 'under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers.'" *Dendy*, 2019 WL 719762, at *5 (quoting *In re Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 (2013)); *see also Mohon v. Nat'l Cong. of Emps. Inc.*, No. 1:19-CV-652 KWR/JHR, 2020 WL 1332376, at *6 (D.N.M. Mar. 23, 2020) ("Similarly, New Mexico Law recognizes vicarious liability and agency theory.") (citation omitted). MOIC may be found to be vicariously liable under one of three theories: actual authority (or "classical agency"[7]), apparent authority, or ratification. *See id.*; *Dish Network*, 28 FCC Rcd. at 6586–87; *Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384, 395 (M.D.N.C. 2015), *aff'd*, 925 F.3d 643 (4th Cir. 2019) ("A seller can be held vicariously liable if there is actual authority, apparent authority, or ratification.") (citations omitted). Although the parties do not explicitly discuss the three theories, the Court finds that Escano's allegations are sufficient to make out a claim for vicarious liability against MOIC under the theories of both actual and apparent authority. "Notably, a plaintiff is only required to demonstrate one of the common law agency theories in order to hold a defendant vicariously [liable] for another defendant's alleged TCPA violations." *See Cunningham v. Cap. Advance Sols., LLC*, No. CV 17-13050 (FLW), 2018 WL 6061405, at *6 (D.N.J. Nov. 20, 2018).

---

[7] "[A]ctual agency[ is] also referred to as classical agency . . . ." *Braver v. NorthStar Alarm Servs., LLC*, No. CIV-17-0383-F, 2019 WL 3208651, at *7 (W.D. Okla. July 16, 2019), *amended on denial of reconsideration*, 2019 WL 5722207 (Nov. 5, 2019).

### 1. Actual Authority

"Actual authority stems from a principal's expressions to an agent." *Mohon v. Agentra LLC*, 400 F. Supp. 3d 1189, 1235 (D.N.M. 2019) (citing *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1251 (10th Cir. 2013)). "The agent has actual authority when he, she, or it 'reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent' to engage in an action." *Id.* (quoting *1-800 Contacts*, 722 F.3d at 1251) (internal quotation marks omitted). In *Abramson v. Agentra, LLC*, for example, the court found that the plaintiff's claims of vicarious liability, based on a theory of actual authority, survived a motion to dismiss where the plaintiff pled that the defendant "outsource[d] its telemarketing and authorize[d] those third-parties to enter into contracts on its behalf." No. CV 18-615, 2018 WL 6617819, at *4 (W.D. Pa. Dec. 18, 2018). Similarly, here, Escano alleges that MOIC "authorized SFG salespersons to represent themselves as agents of [MOIC] to potential customers" and "to sell [MOIC's] insurance plans via telephone on its behalf"; "published marketing material which states that SFG salespersons are agents of [MOIC]"; and "paid SFG sales commissions for the insurance enrollments produced by SFG." (Compl. ¶¶ 61, 63–64, 76.)

MOIC contends that Escano fails to allege that "MOIC had the power to give 'interim instructions,' which is 'the hallmark of an agency relationship.'" (Doc. 20 at 12 (quoting *Smith v. State Farm Mut. Auto. Ins. Co.*, 30 F. Supp. 3d 765, 776 (N.D. Ill. 2014)).) Yet, Escano alleges that "SFG salespersons communicated regularly with [MOIC] and received directions from [MOIC,]" including the "mandate[] that SFG salespersons only reveal [MOIC's] identity . . . if the telephone subscriber retroactively agreed to the TCPA violation." (Compl. ¶¶ 75, 83; *see also id.* ¶ 79 ("The calls were consistent with [MOIC's] directions or statements telling SFG what to do.").) These allegations plausibly support a claim for vicarious liability on the basis of actual authority.

2.      **Apparent Authority**

Apparent authority is the power "to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *DeClements v. RE/MAX LLC*, No. 1:20-CV-02075 DDD/SKC, 2020 WL 9259326, at *3 (D. Colo. Oct. 13, 2020) (quoting Restatement (Third) Of Agency § 2.03). In *Dish Network*, the FCC provided a useful, but not exhaustive, list of "examples of evidence that may demonstrate that the telemarketer is the seller's authorized representative with apparent authority to make the seller vicariously liable for the telemarketer's section 227(b) violations." 28 F.C.C. Rcd. at 6592. These examples include: (1) "evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control," such as "access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information"; (2) "[t]he ability by the outside sales entity to enter consumer information into the seller's sales or customer systems"; (3) "the authority to use the seller's trade name, trademark and service mark"; (4) evidence that "the seller approved, wrote or reviewed the outside entity's telemarketing scripts"; and (5) a showing that "the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct." *Id.* at 6592 (citations omitted). The FCC noted that "evidence of these kinds of relationships[,] which consumers may acquire through discovery[,] . . . should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593. MOIC cites these examples and argues that Escano fails to show that it should be vicariously liable for the calls under this standard. (*See* Doc.

20 at 7–8, 11.) The Court disagrees.

### a.    Escano alleges that MOIC allows SFG access to information.

Escano alleges that MOIC authorized SFG's salespersons to sell insurance on MOIC's behalf. (*See* Compl. ¶¶ 71, 76–77.) To that end, SFG salespersons had access to MOIC marketing material. (*See id.* ¶¶ 69–70.) Escano asserts that during at least one of the phone calls, an SFG salesperson represented herself "as an agent of [MOIC] who was selling insurance via telephone on behalf of MOIC]" and sent Escano an email with an attachment. (*Id.* ¶ 69, 71.) The attachment includes a picture of MOIC marketing material that "reads, 'This is a solicitation of insurance and . . . insurance agents are authorized to sell this Medicare supplement insurance policy on behalf of [MOIC].'" (*Id.* ¶ 70.) Although the marketing material does not contain "information regarding the nature and pricing of MOIC's products and services" (*see* Doc. 20 at 11), the Court finds that the brochure, which purports to offer information on the selection of a Medicare Supplement Plan, is the type of material "that normally would be within the seller's exclusive control . . . ."[8] *See Dish Network*, 28 F.C.C. Rcd. at 6592.

### b.    SFG found customers and received payment for enrolling them in MOIC's insurance plans.

While Escano does not explicitly allege that SFG had "[t]he ability . . . to enter consumer information into the seller's sales or customer systems," *see id.*, he does allege that "[MOIC] had an agreement with SFG whereby [MOIC] would pay SFG for the customers it enrolled in [MOIC's] insurance plans." (Compl. ¶ 78.)

---

[8] MOIC discounts this allegation because it believes the salesperson who sent the email "indicated she was responding to an inquiry from a consumer named 'Jo Becerra[,]' *not* [Escano]." (Doc. 20 at 11 (citing Compl. ¶ 74).) Again, MOIC misinterprets the allegations. The Complaint does not allege that an SFG salesperson was attempting "to contact another consumer named Jo Becerra[,]" but rather that the email was sent *by* "Jo Becerra, who *works* for MOIC and was communicating with the [SFG]" employee, whose name, email address, and phone number were also on the email. (*See* Doc. 27 at 17; Compl. ¶ 72; *see also* Doc. 1-A.)

c.       **SFG had authority to use MOIC's name.**

Escano alleges that "SFG's website has a section called 'Our Trusted Partners' which lists [MOIC] as" a trusted partner. (Compl. ¶ 73.) He also asserts that SFG salespersons had authority "to represent themselves as agents of [MOIC] to potential customers" and "communicated regularly with [MOIC] and received directions from [MOIC]." (*Id.* ¶¶ 63, 75.) Moreover, SFG was authorized to find and qualify "customers for [MOIC]'s insurance plans" and enroll the customers in the plans "on behalf of [MOIC]." (*Id.* ¶ 55.) The Court may infer from these allegations that SFG had authority to use MOIC's name. *See Dish Network*, 28 F.C.C. Rcd. at 6593.

d.       **MOIC knew or should have known that SFG was violating the TCPA.**

Escano alleges that "[MOIC] knew that the volume of insurance enrollments produced by SFG could not be achieved merely by calling customers who had consented to be called by [MOIC] or SFG" and "without using an ATDS." (Compl. ¶¶ 59–60.) He explicitly states that "SFG and [MOIC] knew that the calls SFG transmitted" violated the TCPA. (*Id.* ¶ 82.) He further alleges that MOIC and SFG agreed that the SFG salespersons would only reveal MOIC's identity "if the telephone subscriber retroactively agreed to the TCPA violation." (*Id.* ¶ 83.)

Using the examples set out in *Dish Network* as a guide, the Court finds that Escano has made numerous allegations to support a showing of apparent authority. The Court will deny MOIC's motion to dismiss on this issue.

**THEREFORE,**

**IT IS ORDERED** that Defendant Mutual of Omaha's Motion to Dismiss is **GRANTED IN PART**, and the Court **DISMISSES** any claim against MOIC brought under the TCPA on the basis of direct liability. The motion is otherwise **DENIED.**

ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE